UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY d/b/a AT&T CONNECTICUT, Plaintiff, | : : : : : | |
| v. | : : | 3:09-cv-1787(WWE) |
| ANTHONY J. PERLERMINO, KEVIN DELGOBBO and JOHN W. BETOSKI III, in their official capacity as Commissioners of the Connecticut Department of Public Utility Control Defendants. | : : : : : : | |

## MEMORANDUM OF DECISION

This is a declaratory judgment action concerning a decision by the Connecticut Department of Public Utility Control ("DPUC") issued on October 7, 2009. Plaintiff Southern New England Telephone Company, d/b/a AT&T Connecticut ("AT&T Connecticut"), asks the Court to find DPUC's ruling to be unlawful and to issue an injunction barring its enforcement.

## BACKGROUND

**I.     The Telecommunications Act of 1996**

Congress passed the Telecommunications Act of 1996 ("1996 Act") to promote competition in all telecommunications markets, including markets for local exchange services. Before the 1996 Act, states would typically grant an exclusive franchise in each local service to a local exchange carrier ("LEC") which owned the local exchange network and its component parts. See Worldcom, Inc. v. Conn. Dep't of Pub. Util. Control, 375 F. Supp. 2d 86, 88 (D. Conn. 2005). The 1996 Act changed this system.

1

Under the law, "[s]tates may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999).

Pursuant to the 1996 Act, an incumbent LEC ("ILEC") is obligated to interconnect with a new competitor's facilities "to whatever extent is necessary to allow the competitor's facilities to operate." Verizon Communs., Inc. v. FCC, 535 U.S. 467, 491 (2002) (citing 47 U.S.C. §§ 251(a) and (c)(2)). Section 251 of the 1996 Act creates a three-tiered structure that spells out the duties incumbent upon ILECs to create a competitive market. Section 251(a) requires that every telecommunication carrier interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers. 47 U.S.C. § 251(a). Section 251(b) places obligations on all LECs. Finally, section 251(c) puts additional requirements upon ILECs, including a requirement that it share its network. Worldcom, 375 F. Supp. 2d at 88. The section requires that each ILEC (1) negotiate the terms and conditions of agreements in connecting with new entrants into the market and (2) interconnect with new entrants. 47 U.S.C. § 251(c). In addition, an ILEC must provide to "any requesting telecommunications carrier for the provision of telecommunications service, non-discriminatory access to network elements on an unbundled basis at any technically feasible points on rates, terms and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of [47 U.S.C § 252]." 47 U.S.C. § 251(c)(3). When an entrant seeks access to an ILEC's system, the entrant and incumbent may negotiate the terms of such access. If that fails, the parties can petition the state commission to arbitrate the

parties' open issues. AT&T Corp., 525 U.S. at 371-73.

Section 252 provides the procedures for negotiations for terms of interconnection. Pursuant to section 252(d), when a state commission is called upon to arbitrate rates for interconnection, the rates are to be based on the total element long-run incremental cost ("TELRIC") methodology. In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499 (1996) ("First Report and Order"); 47 C.F.R. § 51.505. The terms agreed upon by the parties are subject to approval by the state commission. 47 U.S.C. § 252(e). The agreement may be rejected only if (1) it discriminates against a telecommunication carrier who is not a party; (2) the implementation is not consistent with the public interest, convenience or necessity; or (3) the agreement does not meet the requirements of section 251, the regulations promulgated pursuant thereto or section 252(d). 47 U.S.C. § 252(e)(2).

Where two carriers must indirectly interconnect, they do so through an intermediate carrier. In re Developing a Unified Intercarrier Compensation Regime, 20 F.C.C.R. 4685, ¶ 120 (2005) ("Further Notice of Proposed Rulemaking"). The immediate carrier provides "transit service" or "transiting." An intermediate carrier transits a signal from an originating carrier to a terminating carrier's end customer.[1] The intermediate carrier is usually an ILEC.

---

[1] Of course, there can be multiple intermediate carriers in a given situation for sufficiently remote originating and terminating carriers.

## II.  AT&T Connecticut and Pocket Communications' History

This action is a challenge to a decision by the DPUC on a petition by Youghiogheny Communications-Northeast, LLC d/b/a Pocket Communications ("Pocket").  Pocket is a wireless telecommunication service provider.  The petition sought a declaratory ruling that Southern New England Telephone Company d/b/a AT&T Connecticut ("AT&T Connecticut") was in violation of Conn. Gen. Stat. § 16-247B.

Plaintiff AT&T Connecticut is an ILEC in Connecticut.  It had a state-granted franchise to act as the exclusive provider prior to the enactment of the 1996 Act.  According to the brief submitted by Comcast Phone of Connecticut, Inc., Cablevision Lightpath – CT, Inc. and Cox Connecticut Telecom, LLC (together, "Carriers"), and as found by the DPUC in its decision, AT&T Connecticut is the only carrier that has direct interconnections with every other competitive local exchange carrier ("CLEC") and wireless provider in the state of Connecticut.

The DPUC is a "state commission" as defined by 47 U.S.C. § 153(48) insofar as it has "regulatory jurisdiction with respect to intrastate operations of carriers."  Defendants Palermino, Delgobbo and Betoski are commissioners of the DPUC and are sued in their official capacities.

## STANDARD OF REVIEW

Pursuant to 47 U.S.C. § 252(e)(6), federal courts have jurisdiction to review state commission decisions and determinations.  Although the 1996 Act does not specify how federal district courts are to review such decisions and determinations, courts have

concluded that the state commission's interpretations of federal law are reviewed de novo. See S. New Eng. Tel. Co. v. MCI WorldCom Communs., Inc., 353 F. Supp. 2d 287, 290 (D. Conn. 2005). The commission's interpretations of state law and its findings of fact are reviewed under an "arbitrary and capricious" standard. See Worldcom, 375 F. Supp. 2d at 92.

## DISCUSSION

In this challenge to the DPUC's decision, there are several issues for the Court to resolve. The first question is whether transit service qualifies as "interconnection" under the 1996 Act. If transit service indeed qualifies as interconnection, is it indirect interconnection governed under 47 U.S.C. § 251(a) or direct interconnection under 47 U.S.C. § 251(c)? Then, if transit service is direct interconnection, must it be provided at TELRIC-based price rates?

### I. Whether Transiting Service Qualifies As "Interconnection" and What Kind of Interconnection Is It?

In its decision, the DPUC found that ILECs must provide transit service pursuant to 47 U.S.C. §§ 251 and 252. AT&T Connecticut contends that the FCC has precluded this finding. Defendants argue, on the other hand, that the FCC has merely denied making a decision on such point.

Interconnection refers to the "the physical linking and use of networks owned by different carriers to permit customers of one carrier to call customers of another carrier." Iowa Network Servs., Inc. v. Qwest Corp., 385 F. Supp. 2d 850, 855 n.6 (S.D. Iowa 2005). The FCC's regulations define interconnection as "the linking of two networks for the mutual exchange of traffic." 47 C.F.R. § 51.5; First Report and Order, 11 F.C.C.R.

15499, ¶ 176. The regulations exclude "transport and termination of traffic" from the definition of interconnection. 47 C.F.R. § 51.5. "Interconnection" refers to the physical linking of two networks through the provision of necessary facilities and equipment. See Southwestern Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n, 530 F.3d 676, 684 (8th Cir. 2008). It does not refer to the provision of any specific service. AT&T Corp. v. FCC, 317 F.3d 227, 234-35 (D.C. Cir. 2003).

Under section 251(c), CLECs do not have the legal obligation that ILECs have to directly connect between carriers. See 47 U.S.C. § 251(c) (only ILECs must interconnect directly). Therefore, CLECs rely on an ILEC to serve as intermediary to connect two users of the network. This service is considered "transit traffic service" ("TTS").

The FCC stated numerous times in dicta that it has not found a duty for an ILEC to provide transit service. This statement is usually in conjunction with a statement that the specific case is not the occasion to determine whether such a duty exists. See, e.g., In re Application by Qwest Commc'ns. Int'l, Inc., 18 F.C.C.R. 7325, ¶ 92 n.305 (2003) ("Although we do not address the merits of AT&T's assertion that Commission rules require Qwest to provide transit service under section 251(c)(2), we note that the Commission has not had occasion to determine whether incumbent LECs have such a duty, and we find no clear Commission precedent or rules declaring such a duty."); In re Petition of WorldCom, Inc. Pursuant to Section 252(e)(5), 17 F.C.C.R. 27039, ¶ 117 (Wireline Competition Bureau, 2002) ("WorldCom Petition") (same); In re Application by BellSouth Corp., 17 F.C.C.R. 25828, ¶ 155 (2002) (same).

More recently, the FCC has started to reconsider this approach. In 2005, the

FCC wrote:

> We seek comment on the Commission's legal authority to impose transiting obligations. For example, competitive LECs and CMRS carriers point to sections 251(a)(1) and 251(c)(2)(B) of the Act in support of transiting obligations. AT&T and Sprint contend that the language in section 251(a) regarding indirect interconnection requires carriers to provide transiting arrangements. In addition, these carriers rely on the "at any technically feasible point" language in section 251(c)(2)(B) in support of transiting obligations. They explain that interconnection at the tandem switch provides access to the full tandem switching functionality, including access to subtending end offices owned by carriers other than the tandem provider. Furthermore, Sprint points to the language of section 251(c)(2)(a), requiring incumbent LECs to interconnect with requesting carriers for the "transmission and routing of telephone exchange service and exchange access," to support transiting obligations.
>
> Under section 251(a) of the Act, telecommunications carriers "should be permitted to provide interconnection pursuant to section 251(a) either directly or indirectly, based upon their most efficient technical and economic choices." ... We seek comment on whether that definition applies, or should apply, in the context of section 251(a). In particular, we ask parties to comment on whether the statutory language regarding the duty to interconnect directly or indirectly under section 251(a) should be read to encompass an obligation to provide transit service. To whom would that implied obligation run? Parties commenting on this issue should address the positions raised in the record and any other arguments concerning the Commission's legal authority to impose transiting obligations.

Further Notice of Proposed Rulemaking, 20 F.C.C.R. 4685, ¶¶ 127-28 (footnotes omitted); see also Qwest Corp. v. Cox Neb. Telcom, LLC, 2008 U.S. Dist. LEXIS 102032, *12-14 (D. Neb. Dec. 17, 2008) (observing that the FCC was soliciting comment on whether transiting qualifies as interconnection); In re Connect Am. Fund, 2011 FCC LEXIS 315, ¶ 683 (F.C.C. Feb. 9, 2011).

The Qwest Corp. court concluded that section 251(c) requires ILECs to provide

transit service based on the FCC's statements in 20 F.C.C.R. 4685. Specifically, the court commented that the FCC's statements "indicate that the FCC's existing rules and decisions do not preclude" such a finding. Qwest Corp., 2008 U.S. Dist. LEXIS 102032, at *13.

Reviewing the applicable FCC regulations and decisions as well as the relevant case law, the Court must conclude that interconnection under section 251(c) includes the duties to provide indirect interconnection and to provide transit service. The 1996 Act was passed to expand access and to promote competition within local telecommunications markets. See Verizon Communs., 535 U.S. at 489. Therefore, the 1996 Act and its attendant regulations should be interpreted so as to promote competition. See Mich. Bell Telephone Co. v. Covad Communs. Co., 597 F.3d 370, 387 (6th Cir. 2010) (Sutton, J., dissenting) ("Who wants a local phone service that connects customers to just a handful of other individuals in the community?").

Reading section 251(c) as requiring an ILEC to provide indirect interconnection is not the large logical jump that AT&T Connecticut argues it is. First, the FCC has never precluded such a finding; but the FCC has never addressed the question directly. Rather, the FCC has declined in dicta to find the appropriate manner to treat TTS and indirect interconnection. AT&T Connecticut rests its argument in great part on the Wireline Competition Bureau's statements in the WorldCom Petition, 17 F.C.C.R. 27039, ¶ 117. Contrary to AT&T Connecticut's characterization of it, this decision by the FCC was in line with other decisions by the FCC. Namely, it declined to find that an ILEC had a duty to provide TTS under section 251(c)(2).

In addition, the Court cannot find that the FCC's failure to definitively rule on the

provision of TTS as an affirmative decision to exclude TTS from the definition of interconnection. For this argument, AT&T Connecticut relies upon the Supreme Court's decision in Geier v. American Honda Motor Co. In that case, the Supreme Court cautioned courts not to "find pre-emption too readily in the absence of clear evidence of a conflict." Geier v. Am. Honda Motor Co., 529 U.S. 861, 881 (2000). The Court cannot conclude that the DPUC's determination conflicts with the FCC's regulations and the 1996 Act or that the FCC's statements demonstrate that the FCC sought to set a definitive rule. Neither the language of the 1996 Act nor the applicable regulations support the conclusion that Congress intended to preclude states from deciding as the DPUC did.

The Court also relies on the fact that interconnection is the provision of equipment and supplies, not a service in and of itself. Requiring interconnection is a means to ensure that an LEC entering a market can connect to the preexisting network. This in turn minimizes the costs to the new LEC by not forcing it to create a duplicate and redundant infrastructure to the preexisting one established by the monopolist incumbent. See Wis. Bell, Inc. v. Bie, 340 F.3d 441, 442 (7th Cir. 2003) ("The competitor will find it difficult to compete unless it is interconnected with the local network. The [1996 Act] provides a machinery for encouraging interconnection.").

By AT&T Connecticut's reading of the statute, if the only way for two new CLECs to connect were through the preestablished hardware and equipment of an ILEC with whom the CLECs could not reach an agreement to provide TTS, the CLECs would be forced to create a new infrastructure redundant to what the ILEC already possesses. Further Notice of Proposed Rulemaking, 20 F.C.C.R. 4685, ¶¶ 125-26. This

redundancy is precisely what the 1996 Act sought to eliminate.

Indirect interconnection is therefore necessary to ensure that new CLECs to a market can connect at minimal cost so as to promote competition within the market. See Qwest Corp., 2008 U.S. Dist. LEXIS 102032 at *8-9 ("Because transit service is essential to indirect interconnections, the text of Section 251(a) strongly indicates that an ILEC is required to provide transit under the Act."); Further Notice of Proposed Rulemaking, 20 F.C.C.R. 4685, ¶ 125 ("The record suggests that the availability of transit service is increasingly critical to establishing indirect interconnection – a form of interconnection explicitly recognized and supported by the Act. It is evident that competitive LECs ... often rely upon transit service from the incumbent LECs to facilitate indirect interconnection with each other. Without the continued availability of transit service, carriers that are indirectly interconnected may have no efficient means by which to route traffic between their respective networks."). Insofar as section 251(c) requires an ILEC to provide equipment to enable carriers to connect, that duty includes indirect connection. See Qwest Corp., 2008 U.S. Dist. LEXIS 102032, *11 ("While the Court was correct in finding that interconnection does not generally include the transport of traffic, an ILEC's obligation to provide transit service is an exception to the general rule.").

AT&T Connecticut also argues that TTS cannot constitute interconnection because it does not involve the mutual exchange of traffic as required by 47 C.F.R. § 51.5. AT&T Connecticut argues that when it acts as a courier between two CLECs, no traffic is originating within its system, and therefore, there is no exchange of its traffic.

AT&T Connecticut misreads the regulation. Pursuant to the regulation, interconnection is the "the actual physical 'linking of two networks for the mutual exchange of traffic.'" Bellsouth Telecomms., Inc. v. Southeast Tel., Inc., 462 F.3d 650, 652 (6th Cir. 2006) (quoting 47 C.F.R. § 51.5). A plain reading of the regulation does not require that there be the mutual exchange of traffic originating within each LEC's network. Rather, the Court reads the language as requiring only that the physical link between the LECs be capable of the mutual exchange of traffic. AT&T Connecticut's reading of the regulation would add language that does not exist. Namely, that the traffic is originated within the AT&T Connecticut system. As an incorrect reading of the regulation, the Court will reject it.

Finally, AT&T Connecticut argues that the exclusion of "transit and termination" from the definition of "interconnection" includes TTS. Transit service includes the transmission of a signal from a CLEC to another CLEC over the ILEC's system. See Qwest Corp., 2008 U.S. Dist. LEXIS 102032 at *14. "Transit and termination," on the other hand, refers to the transmission of a call through the CLEC to the end-user. See Union Tel. Co. v. Qwest Corp., 495 F.3d 1187, 1191 (10th Cir. 2007). Transit service as understood in the law is the carrying of traffic between two CLECs. It does not include the final connection with the end-user. This distinction is critical for the law turns on the fact that transit and termination refers to the transfer of a signal to the CLEC and then the CLEC's transmission of the signal to the end user. The exclusion of transit and termination from interconnection therefore does not affect TTS.

Because the DPUC's decision is not inconsistent with the 1996 Act or the FCC's regulations, the DPUC had the authority to conclude that the interconnection obligations

included the obligation to provide TTS.  47 U.S.C. § 251(d)(3).[2]

## II. How Must Indirect Interconnection Be Priced?

In its decision, the DPUC stated that it expected any change of law provision in the commercial agreements to take effect and require the deletion of the TTS provisions from the commercial agreements.  Therefore, the DPUC required that AT&T Connecticut's TTS rates be revised to conform to DPUC-established pricing levels.  The DPUC then ordered AT&T Connecticut to reduce its TTS to TSLRIC-level[3] for an interim period until new agreements between AT&T Connecticut and the CLECs could be reached.

---

[2] As noted by the Carriers, many state regulatory commissions have reached a similar conclusion to the DPUC.  See, e.g., Petition for Arbitration of the Interconnection Agreement Between BellSouth Telecom., Inc. and Intermedia Comm's., Inc., Alabama Pub. Serv. Comm'n, 2000 Ala. PUC LEXIS 1924, *122 (July 11, 2000); Joint Petition for Arbitration of NewSouth Communications Corp., NUVOX Communications, Inc. KMC Telecom V, Inc., KMC Telecom III LLC, and Xspedius Communications, LLC on Behalf of its Operating Subsidiaries Xspedius Management Co. Switched Services, LLC, Xspedius Management Co. of Lexington, LLC and Xspedius Management Co. of Louisville, LLC of an Interconnection Agreement with BellSouth Telecommunications, Inc., No. 2004-00044, 2005 Ky. PUC LEXIS 810, *22 (KY Pub. Serv. Comm'n, Sept. 26, 2005), overruled on other grounds sub nom. Bellsouth Telecomms., Inc. v. Cinergy Comms. Co., 2006 U.S. Dist. LEXIS 11535 (E.D. KY Mar. 20, 2006); Application of Cox Nebraska Telecom, LLC, Omaha, seeking arbitration and approval of an interconnection agreement, Nebraska Pub. Serv. Comm'n, No. C-3796, Order Approving Agreement, 2008 Neb. PUC LEXIS 30, *3 (January 29, 2008); In the Matter of Joint Petition of New South Comms. Corp. for Arbitration with BellSouth Telecommunications, Inc., NC Util. Comm'n, No. P-772, Sub 8, P-913, Sub 5, P-989, Sub 3, P-824, Sub 6, P-1202, Sub 4, 2005 N.C. PUC LEXIS 888, *131 (July 26, 2005); In the Matter of the Establishment of Carrier-to-Carrier Rules, Ohio Pub. Util. Comm'n, Case No. 06-1344-TP-ORD, 2007 Ohio PUC LEXIS 572, *92-93 (Aug. 22, 2007).

[3] Section 252(d) refers to the TELRIC pricing methodology.  State commissions are free to determine a just and reasonable rate for interconnection.  The DPUC has done so and uses the term "TSLRIC" ("Total Service Long Run Incremental Cost") for its rate.  For the purposes of this ruling, the terms are used interchangeably.

The 1996 Act permits the use of negotiated agreements between exchange carriers to set rates for the transfer of traffic. See Verizon Communs., 535 U.S. at 492; 47 U.S.C. §§ 252(a)-(b). State utility commissions must accept these negotiated rates unless they discriminate against a carrier that is not a party to the agreement or is otherwise contrary to the public interest. 47 U.S.C. §§ 252(e)(1) and (e)(2)(A). When carriers fail to agree on a negotiated agreement, either party has the option under the law to request mediation by the state commission. 47 U.S.C. § 252(a)(2). The state commission is subject to the duties specified in section 251 and the standards set forth in section 252(d) as well as the relevant FCC regulations. Verizon Communs., 535 U.S. at 492-93.

These voluntarily negotiated agreements are encouraged and preferred under the 1996 Act. See MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491, 500 (3d Cir. 2001) ("The Act's clear preference is for such negotiated agreements."); see also Verizon N. v. Strand, 309 F.3d 935, 940 (6th Cir. 2002) (observing that "private negotiation" is the "centerpiece" of the 1996 Act). As such, they are permitted to depart from the strict requirements that state commissions must follow when they set rates. See MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1266 (9th Cir. 2000); MCI Telecomm., 271 F.3d at 500 ("An agreement reached through negotiation need not conform to all the detailed, specific requirements of § 251; negotiation consequently bestows a benefit to those carriers able to resolve issues through negotiation and compromise."); see also Qwest Corp. v. PUC of Colo., 479 F.3d 1184, 1188 (10th Cir. 2007). As the FCC has indicated, the rules are meant to create a default regime that encourages mutually agreeable arrangements between the

parties.  First Report and Order,  11 F.C.C.R. 15499, ¶ 752.

Under the 1996 Act, an ILEC must provide service "on rates, terms and conditions that are just, reasonable, and nondiscriminatory...." 47 U.S.C. § 251(c)(2)(C).  Furthermore, the ILEC must negotiate in good faith, which includes the obligation not to "refus[e] to include in an arbitrated or negotiated agreement a provision that permits the agreement to be amended in the future to take into account changes in Commission or state rules."  47 C.F.R. § 51.301(c)(3).

The DPUC argues that it had the authority to impose interim rates based on TELRIC because of (1) AT&T Connecticut's failure to comply with the DPUC's repeated directives to submit a cost of service study and (2) the disparity between the rates charged and the costs incurred by the provider.  The law supports neither of these explanations for the DPUC's exercise of its authority.  The chief question in this analysis is to what extent the DPUC's decision can apply to other negotiated agreements beyond those at issue in the decision.

In Wis. Bell, the Seventh Circuit Court of Appeals ruled that the state utility commission's attempted to set TELRIC-based pricing for all carriers was preempted because it "short-circuits negotiations, making hash of the statutory requirement...." Wis. Bell, 340 F.3d at 445.  The Court of Appeals observed that the commission's rule would undermine the negotiated legislative consensus that went into the 1996 Act and Congress's preference for negotiated resolutions.  Several other Courts of Appeal have ruled similarly.  See, e.g., Verizon New Eng., Inc. v. Me. PUC, 509 F.3d 1, 9 (1st Cir. 2007) (addressing section 271); Pac. Bell v. Pac-West Telecomm, Inc., 325 F.3d 1114, 1127 (9th Cir. 2003); Verizon North, 309 F.3d at 939-44.

To the extent that any negotiated agreements do not contain a change-of-law provision, the DPUC's decision can have no effect. Contrary to the Carriers' argument, a negotiated agreement lacking a change-of-law provision is not void. The regulations state that refusing to including a change-of-law provision in a negotiated agreement violates the duty of good faith. 47 C.F.R. § 51.301(c)(3). This language does not require that such clause be included, but that it be included upon demand. There is no evidence before the Court of whether such provisions were included in the relevant negotiated agreements and, if they were not, whether the CLEC demanded them during negotiations. The language of the regulation makes clear that only such demand can trigger application of 47 C.F.R. § 51.301(c)(3).

As for those agreements that include such provision, the DPUC's conclusion that interconnection includes TTS would trigger the application of the provision. Without the agreements before the Court, however, the Court cannot determine how the DPUC's decision would affect the agreements.

Similarly, without addressing the actual terms of the agreements, the DPUC's decision to provide for an interim pricing level is arbitrary and capricious. See Pac. Bell, 325 F.3d at 1127-28. Pursuant to the 1996 Act, the parties should be given the opportunity to renegotiate their agreements – the preferred tool for setting rates – if permitted under the agreements and the relevant contract law. Should the parties fail to reach an agreement, the DPUC can certainly require AT&T Connecticut to provide TTS at TELRIC-based rates, but only pursuant to sections 252(a)(2)-(b). See Qwest Corp., 2008 U.S. Dist. LEXIS 102032 at *15-16; First Report and Order, 11 F.C.C.R. at 15844. The DPUC's decision will be reversed and remanded only as to this issue.

15

**CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the DPUC's decision in part and REVERSED and REMANDS the decision in part in accordance with this ruling as to interim pricing level. The Clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this 6th day of May, 2011.

/s/
Warren W. Eginton
Senior United States District Judge